case that was based on three grounds, the financial services exclusion, the cooperations clause and the consent judgment entered into between ATIF and Section 10 was in bad faith. I'll just tell you, it looks to me like Zucker fits this one, hand in glove. Thank you for letting us know that the court wanted to discuss that. I've not let folks know before and you spring it on them in oral argument and you get the deer in the headlights. It's not fun for anybody, is it? No. Thank you. The Zucker case, I'd like to get right into that if I can. Again, the exclusion issue in our case is whether the conduct, the malicious prosecution arises out of the rendering or failing to render financial services by any insured to others, the handling of an insurance claim. So does it arise out of the handling of the insurance claim as the term arising out of Well, defined by the Florida Supreme Court. And interpreted in Zucker. And of course, the Florida Supreme Court case, the Torres case is what this court in Zucker was analyzing. But the exclusion in Zucker was a prior acts exclusion. And this court held that the fraudulent transfers at issue in that case were related to the prior bad acts that arise out of there. But what this court held was it was not a coincidence that the insolvency and the misconduct in that case converged. Instead, the misconduct was a significant contributing cause of It was basically a but-for cause. And once you have a but-for cause, it arises out of. Because you can't have something arising out of nothing. And if it arises out of a but-for cause, then it meets the terms of the law. Well, and it would be our position, Your Honor, that both in Zucker and then in the later case that we fought, the Lloyds versus FDIC case, of course, not being a case from this decision's interpreting arising out of, it's not just but-for cause. A but-for cause would allow the insured, in this case, ATIF, is an insurance company. Anything that they do, presumably, could be a but-for cause from providing insurance services. The here But they do things other than provide insurance services. And therefore, it's not illusory. Right? Yes, Your Honor. So the issue here is we have the insurance services were providing the claims handling for the original title claims that resulted from the fraud by Natalia Wolf. Did the decision then by ATIF, having finished the handling of those claims, having decided it wanted its money back, having found that Natalia Wolf had invested the money in this company over here, having filed a lease pendant against my client's property, having maintained that, despite information that there was not a valid claim there, having exposed itself to a malicious prosecution claim that lawyers at Carlton Field said could be an $80 million exposure, does that arise out of the earlier providing financial services, the handling the title claims? If you pay an insurance claim and you sue somebody else to get, you know, call it subjugation, but if you sue somebody else in a salvage action, it seems self-evident it arises out of, to me, as Taurus interpreted arising out of. And we would argue that it's not, Your Honor, because there is an independent business decision like the court in the FDIC case, which we filed the supplemental authority, distinguished this court's decision in Zucker. But there always is an independent business decision. You don't have to pursue your remedies. You don't have to take the next step. You don't have to take the next step. And you don't have to take the next step in a way that creates a malicious prosecution claim. And so, you know, again, Your Honor, yes, if arising out of means but for causation only, then I think that's different than what the Florida Supreme Court has ever said. If you look at the race case from the Florida Supreme Court, which is the case that talked about a fight that ensued after an automobile collision, OK, what the court said there was that does not arise out of the automobile collision. It certainly was but for a cause. But in race, the court said that's not enough because it was not part of the inherent nature of the use of the automobile as such. And it merely contributed to cause the condition which produced the injury and did not itself produce the injury. And that's what the court looked at in Torres Holdings as well. What caused the injury? In Torres Holdings, the gun caused the injuries for which the damage was being claimed. In this case, the injury was not handling the claims of the hundreds of homeowners that were defrauded by Ms. Wolfe. It was then deciding after those claims were handled, after that was done, to go ahead and proceed with this lease pendants action and to maintain it to the point of a loss to my client. And then also, we think this court should focus on the fact that this is not a prior bad acts exclusion. It's an arising out of services exclusion. And this court has a decision that talks about what arises out of services. And that is the Maryland casualty versus Florida Atlantic case, the hospital case, where this court held that the transport of a patient arose out of the provision of medical services because it was an integral or inherent part of providing those services. So again, not just a but-for causation. It would be . . . It is, Your Honor. This case does not involve the arising out of language that was issued, that was at issue in Zucker.  And it doesn't, Your Honor. But this case does. Yes. But what the court in distinguishing Zucker said was even if we were to address that argument, Zucker would not apply because there was an independent business decision. And the difference being . . . You've got dicta in an unpublished opinion. And we've got this court's decision in the arising out of services case, which is the Maryland casualty versus Florida Atlantic case. We've got the Florida Supreme Court case in race. And we've got the El Mayor case, which is the gas siphoning case, where the Florida court held that where there was an explosion when someone was siphoning gas from a car, that did not arise out of the use of the gas. I mean, the use of the car. Because the car itself was harmless until someone came out with a cigarette and acted upon it. Again . . . Your problem in so far as Maryland casualty limiting Zucker is that's yet another unpublished opinion. Yes, Your Honor. But again, what was Zucker looking at? What does this court have to look at in a diversity case? It was looking at Torres Holdings. And Torres Holdings said in that case, there still has to be some sort of cause. There has to be some contributing factor. It has to either be caused by, originate from, have its origin in, grow out of, flow from the incident to, or have a connection with. And it does require some level of causation greater than coincidence. And what the Florida Supreme Court has done with that language, we see in the race case. And we see the fact that, yes, the car was the but-for causation of the fight in that case. Just like if Natalia Wolf had never defrauded these people, and those people had never made title claims, and ATIF had never paid them, and they had never then closed their files and decided to get their money back, and then filed what might have started out as a valid effort to recover those monies, but ended up being a malicious prosecution. But for all that, we wouldn't be here. But that was not enough for the Florida Supreme Court in the race case. And again, what this court was doing in Zucker, it said, these things, significant contributing cause, it was an element of the claim. The court said it wasn't just a mere coincidence. And it would be our position, then, in this case, it is just a mere coincidence, or not enough of a causation to trigger the exclusion. The cooperation clause would be the next issue on summary judgment. And, of course, this court, the trial court found, as a matter of law, that the policy was void because of a failure to cooperate. And on that argument, we've raised a number of issues on which, if the court doesn't have questions, we can rely on the briefs. But I do want to point out a couple things. Whether, and this relates to an alternative argument raised by travelers, too, whether an insured can reject a conditional defense is a big issue in this case. And in this case, the defense offered by travelers was, this exclusion entirely negates the coverage, and we want our money back for defending you. So this is exactly the type of situation where the insured had a right, under Florida law, to come in and reject the defense and to enter into the Koblenz Agreement. In terms of the damages amount, there's been a lot of discussion about whether the damages amount in this case was reasonable or the product of bad faith. And we would just point the court, really, to a couple of items of evidence in the record that it's our position at least created a fact question on that, that the trial court should not have resolved as a matter of law. The appraisals. The appraisals showed a difference of $43 million. And the evaluation by the defense attorneys a year and a half before they were negotiating with my client that said this was between a $40 and $80 million case. The... To the extent that this court has any questions beyond the arising out of, I'd be happy to answer them. But if I can just take a brief second to go back to that, because I can tell that that's what the court is focused on. We would ask the court to look not only at the Zucker case, but also at the Florida law that created the basis for the Zucker case. Go back to the Torres Holdings case and see that the court was looking at the fact that the damage in that case was caused by the insured's product. Go back to the race case and see that the court in that case, the Florida Supreme Court again, was looking at the fact that the damage was caused by the fight and that there was a separate decision made, just like there was here in this case. Thank you. Thank you. Mr. Gunn, Mr. Ellington, unless I'm mistaken, you have 60 seconds. That's correct, Your Honor. May it please the court, Tom Ellington, Raymond, Tom Ellington, on behalf of Attorneys Title and Florida Title, I'm just going to say we are going to rely on our briefs, including the Bannon case and the reply brief, which this court just affirmed a week ago on other issues, and to point out that these companies being sued when they shouldn't have by travelers is a viable issue for them because travelers are still trying to get costs from them in the district court. So, we would ask that you rule as we've requested in the brief. Unless there are any questions, I'll stand on the briefs. Thank you. Thank you. We appreciate the 34 seconds you gave us back. Ms. Besvinick. Yes, Your Honor. Thank you. Laura Besvinick on behalf of Travelers in St. Paul. Obviously, we agree with Your Honor that the Zucker case is on point. So, I just want to talk about why we agree on that. Because it obviously . . . Because then we win, but that would be the simple reason. And so well stated that you just have nothing to add to it. I'll sit down. But I want to pause on this seriously, which is that for Zucker, it were wrongful acts which result in insolvency, and insolvency was a fundamental element of the fraudulent transactions. And as Your Honor pointed out, no one made them commit the fraudulent transactions during the policy period. That was an independent decision. The point was the stuff that happened before, the wrongful acts that resulted in the insolvency, were in connection with the fraudulent transactions. So here, attorney's title, the insured, was itself an insurance company. Like in Zucker, a sophisticated insured who chose a policy that didn't provide coverage for this part of its business. It made that decision. So, attorney's title pays title claims arising out of a fraud. It then does whatever an insurance company does. It tries to get its money back. It brought an action against Ms. Gunn's client, Section 10. And Section 10 believed improperly. And that action, which flowed from in connection with more than but-for cause, the salvage action isn't the payment of the original claims, is part and parcel of trying to get that exact money back. And the claim that Section 10 then brought back against attorney's title was a malicious prosecution claim for prosecuting that exact action that had been brought based on the payment of those exact title claims. So, in terms of the linkage for in connection with, the links are completely tight. I think it more than meets the TORRA standard in that regard. I think, as Your Honor pointed out, the FDIC case that was filed with supplemental authorities and unpublished decision, so is the Maryland case. But more than that, even the Maryland case really supports it. It's arising out of medical services. What was found to arise out of medical services, the wrong was having to do with transport. It wasn't the medical service itself. So, again, you have this linkage between the medical service, the transport, the negligence. And this Court's other published opinion in this area really, and following TORRA's, is the James River case, which was a pollution case, where, again, you have the pollution. And the wrong is the negligence in failing to identify tanks that were on the property. Again, the negligence is independent of the pollution, but there is no claim for testing and missing it except for the fact that the pollution occurred in the first instance. So, it was covered by the pollution exclusion and the arising out of language. So, we think that the arising out of ends the analysis for the Court. But I want to pause there because, in fact, Section 10 has to win on every one of these issues to require reversal here, not just the exclusion. Before you move from the exclusion, the two policies, the travelers and St. Paul policy, both use the arising out of language, but slightly different wording. Is there any significance to the difference in wording between the two policies? One is called an insurance company exclusion. There are several applicable exclusions in the access policy, the St. Paul policy. For all intents and purposes, they're the same. I think there's some additional language in the primary policy, but they all have a reference back to claims handling. And that service being provided being the handling of claims, because they're professional services exclusions, which are often underwritten. They're underwritten differently and they're typically covered by a different policy. It's just that the undisputed evidence in this case was attorney's title made the decision not to buy a policy for that. So, I don't think the differences necessarily are relevant here in that they're both claims handling and they're both arising out of. With respect to the other issues on cooperation here, again, this court has seen a lot of these cases where what the insured does is they perceive a risk that their insurance doesn't cover them for or that they don't have enough insurance for. And so, the way out is to reach a deal with the claimant and assign the liability because that way it's not their problem anymore. And this court has seen a lot of them, from the city of Jacksonville case to Sidman most recently. And so, that's the pattern we have here. The court addressed it in the American Pride case also in which what the court said was if you go off and secretly negotiate a covalence agreement, one of these deals where you're going to offload your liability onto the insurance company by assigning the rights against the insurance company with your putative adversary, if you're secretly negotiating that before you've rejected a defense, that's a problem. And in American Pride, this court sent the case back for trial if the court had granted summary judgment, but the case was very different from this case. In that American Pride case, the trial court had found that the rejection was improper because they were really at the preliminary stages of negotiating. This is completely different. The undisputed evidence here was this agreement was completely negotiated, everything except the signatures, every word, every paragraph, every period, every comma was decided before attorney's title sent the email rejecting the defense that had been offered several days earlier. And significantly, and extraordinary to me because I do this all the time in terms of representing insurance companies, is Section 10 has argued that attorney's title had no duty to cooperate until it accepted money in defense. And as the trial court in the city of Jacksonville said, the duty to cooperate serves a really fundamental purpose in the policy. One is to forestall collusion between the insured and the injured third party, but it's also to allow the insurance company to do what it needs to do. If a claim occurs and it's tendered, that it can investigate it, that it can talk to the insured, and that part of that duty is to be open and honest with the insurance company. Now, this case is extraordinary in that there was actually no claim pending. Because this was a potential malicious prosecution claim and the underlying claim was still pending, attorney's title hadn't lost, Section 10 really needed attorney's title's help in order to have a claim, in order to submit a claim for malicious prosecution under the policy. And so, because at the point when it first comes to traveler's attention, the state court judge had actually denied the motion to amend to assert the malicious prosecution claim because it wasn't ripe. But nonetheless, they started down this path, which ultimately resulted in the Comos Agreement, which is why the trial court ruled, as she did, that this was such a methodical venture between Section 10 and attorney's title to get to this result. Because what attorney's title was concerned about is you heard the big numbers that were being thrown around by Section 10, they just wanted out. And they were very honest in their testimony. They said that. And this court in Sidman said, when that's what's going on, when they will do anything just to get out, that's not okay. And that brings us to the third element that the court ruled on in the trial court, which was that there was no effort to minimize liability. To have an enforceable covalence agreement, you need coverage, you need a wrongful refusal to defend, and the settlement has to be both reasonable in amount, which is what a prudent person would pay if they were paying it, and it has to be not in bad faith. And one of the definitions that the courts have adopted, the Florida courts and affirmed by this court, have adopted is an effort to minimize liability. And there was no such effort here. The undisputed testimony is that the covalence agreement was drafted. But isn't that the standard provision of the covalence agreements? We confess to everything. You limit the liability. Well, what this court said in Sidman was, is that holding that the failure to minimize liability defeated the covalence agreement, was that the evidence supports the inference that the settlement agreement was negotiated in bad faith, as it shows that Culberth was willing to lie down and accept the judgment of any amount against it, so long as it would not be on the hook to satisfy the judgment. A reasonable party would not be indifferent to the amount of a judgment entered against it or its own money on the line. I just, I don't remember one of these in which the insured said, or there was evidence the insured said, I'll sign the covalence agreement, but not for that much above my liability. Even though you give me a complete release, let's be fair to the insurance company. They're always fair to us. And let's cut that by $500,000. I've never seen that. I take your point, Your Honor, but that's the problem. The Florida case is going all the way back to I think it's either the 70s or the 1980s, maybe earlier than that. The Steele case, which is still good law. I still say it all the time. It's an intermediate Florida appellate court case. And what Steele said was these kind of agreements are kind of dicey in the following respect, which is these people aren't really at arm's length when they're agreeing to these agreements. But they're almost always enforced, almost always. Actually, no, Your Honor. There's a lot of skepticism about these covalence agreements for exactly this reason. I think there's one thing, and maybe my view is limited because the ones that get to us by definition weren't thrown out. Maybe that's the reason. That's my gut, Your Honor. But in terms of looking at this court side and the Jimenez case, which is unpublished, but the Sidman case, which is published, looked at the fact that there was no actual negotiation, that there was no real discussion of the amount. And that's what happened here. Carlton Fields drafted the settlement agreement, and it left the amount blank so that Section 10 could fill in what it wanted, and they did. And it changed at one point late in the process. It didn't come from attorney's title. The change in the number didn't come from attorney's title. That's the only thing you know for sure. Six people testified on behalf of attorney's title, four lawyers and two representatives, and none of them negotiated the number. And that evidence was undisputed. So we get to, it's this pattern of the creation of the co-bonus agreement. Everything that the parties did, attorney's title and Section 10, over the course of the summer, was to pull together this agreement, all while in communication with travelers, saying, well, we're talking about settlement, but are there any written settlement demands? Nope. Well, you know, if there's going to be an opportunity to settle it, and I know there's no claim pending, but we're all ears, tell us if there's an opportunity. And if you think there is an opportunity, tell us why you think it's a good deal, why you think we should do it. No, Section 10 doesn't want us to tell you that. Okay. So it's a situation where you have the, and I want to be clear about this, there's an exclusion, and we believe the exclusion applies. But we didn't deny coverage. At the end of the day, travelers wrote and sent a reservation of rights letter that says, yeah, we think this coverage exclusion applies. But you know what? We're going to give you a defense because the testimony, undisputed, is that the traveler's adjuster spoke with the Carlton Fields lawyers, talked to them about the merits of the case. They said this is a highly defensible case. We think we're going to win the motion to dismiss. And they had a discussion about the case, and travelers said, we're going to defend you under a reservation of rights. That's on Friday. On Monday, there's a cobalt. Between Friday and Monday, is there any indication to travelers that, hey, this is what we're going to do? No. Just the opposite of the American Pride case where they said, if you don't do X, we will do a cobalt agreement. Again, not that the law requires that, but that didn't happen here either. So all of these factors, in addition to the strength of the exclusion, we would argue support affirmance of the trial court's decision here. Thank you, Counsel. Ms. Gunn, three minutes. Thank you, Your Honors. So the question on the but-for causation issue with regard to the arising out of, again, we would ask this Court to look back at the Florida law, the Florida Supreme Court cases and the intermediate appellate court cases that led to and underlie this Court's decision in Zucker. And the question then becomes, is not only pursuing the segregation action or the salvage action, but filing the lease pendants, maintaining the lease pendants, saying we're going to shake some money out of them and refusing to file a bond. Is that the lighting a cigarette in the siphoning case? Is that the getting in a fight after a car accident in the race case? Or is that something like we have this continual investment in a company that's going under? And we would suggest that the Florida Supreme Court, the Florida courts, in the race case, and there were a number of auto cases discussed in that line of cases that rejected the idea that it's simply but-for causation, that it has to be more than that. And we would ask the Court, if there's uncertainty about that, that the Florida courts should decide this issue. We do also have to address the difference, Judge Gales, you asked the difference in the two contracts. The primary policy, the exclusion is more limited because it involves services to others with respect to a contract of insurance. So was ATIF acting with respect to a contract of insurance, providing services to others in maintaining this action? Opposing counsel was correct. We do have to win on all of these issues. So I'd just like to briefly address the Koblins. There was no secrecy here. Mr. Alligat told travelers multiple times, at least five that I found in the record, that they were negotiating with Section 10. The letter in June 11 says, Section 10 has indicated a desire to resolve the case in a manner that would fully protect attorney's title. This means a Koblins agreement. That was months before the agreement was entered into. The City of Jacksonville case and the other cases that are relied on by travelers, the insured in those cases accepted the defense and did have obligations. And this is not a case, we're not arguing that there's no duty to cooperate in an investigation or things like that prior to the filing of the suit. But recall here that travelers took the position that it had no obligations to even evaluate coverage before there was an active claim. This court in Zucker mentioned that the carrier in that case did a coverage evaluation based on a pre-suit claim. That's the proper thing to do. And there was no collusion to create that claim. The arbitrator had already made a ruling against the unjust enrichment claim, and everyone, quote, knew the malicious prosecution claim was coming. This is not Section 10 just throwing around numbers. These numbers came from the independent defense counsel, Carlton Fields' evaluation of the case a year and a half prior. It was $40 million. I'm sorry, apart from the numbers. Yes. Regarding cooperation and whether or not there was bad faith or not, the thing that this underlying idea here that ATIF and Section 10 were going out of their way to hide this negotiation from travelers, why wouldn't one reasonably assume that, which is what the district court did? And there's a difference between doing something and not telling someone you're doing it and doing something and telling someone you're doing it, but you're not telling them everything because you feel you can't, right? You lost me. Okay, I'm sorry. What attorney's title said to travelers on multiple occasions was, we're negotiating with Section 10. That was not a secret. They also said, we're not telling you everything about these negotiations because Section 10 has taken the position that we can't because there's a mediation privilege. If you travelers feel like any of this is wrong, if you feel like we need to disclose the details to you, let us know. Travelers never came back and said, yeah, you need to disclose the details to us. We are part of this. We want to participate. We are stepping in to do our coverage evaluation. This wasn't a secret. They were told that they weren't being told the details of the negotiations. They were told that the negotiations were going on. They were asked, do you have a problem with this? And they never said that they did. Thank you, counsel. Thank you. We'll take that case under submission and stand in recess. Bye-bye. Thank you.